UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

IN RE: DORVILIER AND HARRY'S NURSERY
REGISTRY

**MEMORANDUM DECISION AND ORDER**

16 Civ. 01765 (AMD) (LB)

------------------------------------------------------------ X

**ANN M. DONNELLY**, District Judge.

The petitioner, who is on probation, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] On May 10, 2012, following a jury trial, the petitioner was convicted of two counts of Grand Larceny in the Third Degree and eleven counts of Grand Larceny in the Fourth Degree. He challenged his convictions on direct appeal, and on November 5, 2014, the Appellate Division, Second Department affirmed his convictions. On April 12, 2016, he filed the instant habeas petition; he asserts that his trial and appellate lawyers were ineffective because they did not effectively challenge the sufficiency of the evidence against him. For the reasons that follow, the petition for a writ of habeas corpus is denied.

---

[1] "An individual on probation or parole is 'in custody' for purpose of federal habeas corpus proceedings." *Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 375 (E.D.N.Y. 2013) (quoting *Rosato v. N.Y. Cnty. Dist. Attorney's Office*, No. 09 Civ. 3742(DLC), 2009 WL 4790849, at *4 (S.D.N.Y. Dec. 14, 2009)).

1

# FACTUAL BACKGROUND

I. <u>Overview:</u>

The petitioner, Harry Dorvilier, is the owner of Harry's Nurses Registry, Inc. ("Registry"), a company that provided nurses to patients in need of home care. (Trial Record ("Tr."), Affidavit of Johnnette Traill in Opposition to the Petition for a Writ of Habeas Corpus ("Traill Aff."), ECF 6, Ex. 2-7 at 131, 163, 192, 389-390, 487.)[2] At the time of trial, the Registry employed over 100 nurses and had been in business for over twenty years. (Tr. 139, 148.)

The petitioner was charged with grand larceny based on allegations that between August of 2006 and November of 2007, he wrongfully withheld funds from the nurses by deducting one dollar an hour from their paychecks. (Tr. 29-65, 149, 167-168, 197, 274, 303, 333, 359-360, 379, 438, 451, 553.) The trial evidence established that he deducted over $25,000 from at least thirteen nurses' paychecks, and used the money to pay the Registry's outstanding workers' compensation premium. (Tr. 512-521, 723-725.)

Pursuant to New York's workers' compensation law, employers are required to maintain workers' compensation coverage for employees, and may not charge any portion of the coverage to their employees. (Tr. 491-493.) In contrast, companies are not required to pay workers' compensation coverage for independent contractors, and may deduct from their paychecks to cover the cost. (*Id.*) Thus, the jury's determination of whether the plaintiff was guilty of grand larceny turned on whether the nurses were employees or independent contractors. (Tr. 723-733.)

II. <u>Criminal Trial</u>

Queens County Supreme Court Judge Joel L. Blumenfeld presided over the petitioner's trial. (Tr. 101-744.) Sixteen nurses testified about working for the Registry and the deductions

---

[2] This state court record is paginated consecutively, with each page beginning with the letter "A" to indicate that the record was submitted on appeal. I refer to the same numbers but omit the letter "A."

from their paychecks. (*Id.*) Three witnesses testified about the workers' compensation system: Steven Carbone, district manager for the Long Island division of the New York Workers' Compensation Board; Effie McCartney-Donaldson of the Office of Fraud Inspector General of Workers' Compensation; and Lauren Hill, an underwriter with New York State Insurance Fund. (*Id.*)

## A. The Distinction Between Employees and Independent Contractors

### a. The Nurses' Testimony

The nurses testified that as part of the Registry's hiring process, they were required to pass a test of their medical knowledge and to present credentials, including proof of medical malpractice insurance coverage. (Tr. 131-132, 161-162, 191-192, 214-215, 269-270, 299-300, 353, 391, 459.) Once hired, the nurses were required to sign an agreement affirming that they were "independent contractor[s]" and would be "responsible for all income taxes (Health Insurance, Mal-Practice Insurance, etc.) [sic] which may be due from the income derived pursuant to this contract." (Tr. 745; *see also id.* 181, 210, 292, 746-753.) The agreement did not specify that nurses were required to secure their own workers' compensation insurance or that money would be deducted from their paychecks for that purpose. (Tr. 248-249.) Several nurses testified that they did not understand the meaning of the phrase "independent contractor" or the consequences of being classified an independent contractor versus an employee. (Tr. 181, 249, 462.)

The business operated as follows: when an assignment became available, the Registry would contact a nurse who could then accept or reject the assignment. (Tr. 132-133, 162-163, 192-193.) The nurses worked under the supervision of a registered nurse employed by the Registry. (Tr. 133, 156, 178.) The Registry did not provide nurses with medical equipment, (Tr.

3

163-164, 178, 194, 205, 216, 237, 290, 327, 385), nor did it provide paid vacation (Tr. 150, 177-178, 208) paid sick days, (Tr. 178, 317, 369) health insurance, (Tr. 207) social security benefits, (Tr. 148, 177) or malpractice insurance. (Tr. 148, 177, 230, 342.) It did give nurses timesheets to track their hours, forms to log notes about patients, (Tr. 134, 164, 195, 217, 356) and badges that included their names and the company's name. (Tr. 561-562.) The Registry also offered in-service trainings on topics such as new equipment and technology, new medication and treatment techniques, and administrative matters. (Tr. 134-135, 225, 325-326, 399, 441, 561.) The petitioner signed the nurses' paychecks, which he issued on a biweekly basis. (Tr. 136-139, 193-194, 216-217.)

    b. Steve Carbone's Testimony

Steve Carbone was the district manager for the Long Island district of the New York Workers' Compensation Board. He testified as an expert about the distinction between employees and independent contractors, as well as an employer's obligation to provide workers' compensation coverage.[3] (Tr. 472-508.) He explained that independent contractors work "without the direction and control of a business," and are generally not in the same field "as the business that is hiring them to do so something." (Tr. 481-482.) Generally, independent contractors "can come and go as they please." (Tr. 482.) Carbone testified that New York defines employees more "liberal[ly]" than other states, and that "anyone providing services to an employer can be deemed to be an employee or anyone providing services to a business can be deemed an employee of that business." (Tr. 479-480.) Thus, an individual classified as an independent contractor by the IRS for tax purposes is not necessarily an independent contractor under New York workers' compensation law. (Tr. 482.)

---

[3] The New York Worker's Compensation Board is the state agency responsible for ensuring employers' compliance with New York workers' compensation laws. (Tr. 475.)

4

Carbone explained that the Registry would not be required to provide workers' compensation coverage if the nurses were independent contractors; they could be required to purchase their own policies, (Tr. 484), or they might contractually agree to have workers' compensation deducted from their paychecks. (Tr. 492.) If the nurses were employees, however, the Registry would be "solely responsible" for providing workers' compensation. (Tr. 484.)

Finally, Carbone expressed his opinion that the nurses were employees. He considered the following factors in reaching that opinion: the written forms the nurses filled out before starting work, whether the nurses contracted directly with clients, the extent to which the Registry trained the nurses, the amount of direction and control the Registry had over the nurses, the extent to which the nurses had flexibility to "come and go" as they pleased, and whether the nurses were paid on an hourly basis. (Tr. 483-489).

### B. The Paycheck Deductions

#### a. Lauren Hill's Testimony

Lauren Hill, an underwriter at the New York Insurance Fund, testified about the Registry's workers' compensation policy. (Tr. 568-591.) She wrote the policy, which was active from February 7, 2006 to June 19, 2007, and she maintained the Registry's records. (Tr. 569, 579.)

Hill testified that on August 2, 2006, she audited the petitioner's business and discovered that certain nurses who filled out 1099 IRS forms were not covered by the Registry's policy. (Tr. 580-581.) Accordingly, she adjusted the policy to include these nurses, which increased the petitioner's payroll amount and resulted in higher premiums. (Tr. 581-582.) The petitioner made regular payments towards the insurance of the policy from March of 2006 through May 2, 2007

5

for a total of $458,333.60. (Tr. 586-588.) At the time of trial, there was an outstanding balance of $122,729.01 on the account. (Tr. 588.)

b. The Nurses' Testimony

The nurses testified that between 2006 and 2007, the petitioner deducted an extra dollar per hour from their paychecks for workers' compensation insurance.[4] (Tr. 29-65, 149, 167-168, 197, 274, 303, 333, 359-360, 379, 438, 451, 553.) Almost all of the nurses testified that the petitioner did not ask their permission before making these deductions. (Tr. 197, 274, 333, 360, 379, 438, 455, 553.) A few, however, recalled receiving a letter notifying them of the deductions. (Tr. 417, 431, 553.) One nurse said that the letter gave her the option of accepting or declining to the deductions. (Tr. 553.)

Another nurse testified that sometime in 2006, before the deductions began, a Registry supervisor and the petitioner met with the nurses. (Tr. 219-220.) According to her, several nurses complained about the deductions, but the petitioner stated that he was required to pay for workers' compensation insurance. (Tr. 148-149, 451.) Most of the nurses did not know whether or not they were covered by workers' compensation insurance, and stated that the petitioner did not show them copies of the policy. (Tr. 304, 323, 360, 379, 394, 419, 439, 451-452, 554.) Several nurses continued to work at the Registry after this meeting. (Tr. 149, 226-227, 297, 301, 331, 416.)

c. Ellie Donaldson's Testimony

Ellie Donaldson, a Special Assistant to the New York State Inspector General, testified that she supervised the investigation of the Registry and reviewed the petitioner's payroll

---

[4] The prosecutor introduced checks and paystubs showing that, between 2006 and 2007, the petitioner deducted one dollar an hour from the nurses' paychecks. (Tr. 142-146, 170-176, 199-204, 221-224, 242 - 245, 277-286, 335-340, 361-366, 381-383, 395-398, 421-427, 440-441, 452-455, 554-561.)

6

records. (Tr. 510.) She found that the petitioner deducted a dollar per hour from the nurses' checks to pay for workers' compensation, for a total of more than $25,000 from at least thirteen nurses. (Tr. 512-521.)

## C. Summation

### a. Defense's Summation

Defense counsel argued that the petitioner could not be convicted of grand larceny, which requires proof that he intended to steal property from its rightful owner. (Tr. 634-635.) He asserted that the state did not prove that the nurses were the "owners" of the money that the petitioner deducted from their paychecks, because the money was never transferred to them. (Tr. 635.) He also characterized the nurses as independent contractors, not employees. (Tr. 623-624.) He emphasized that the nurses "signed . . . agreements indicating they were independent contractors;" "maintain[ed] their own malpractice insurance;" got "paid when they work[ed]" and received "[n]o sick time," "[n]o vacation time," and "[n]o health insurance." (*Id.*) Accordingly, he argued, the petitioner made a commonly accepted business decision to require that the nurses pay for their own workers' compensation insurance; he did not intend to steal from them. (Tr. 632-633.) Finally, defense counsel argued that the nurses implicitly consented to the paycheck deductions because they continued to work for the Registry even after they knew about them. (Tr. 620-621.)

### b. The State's Summation

The prosecutor argued that because the nurses had a possessory interest in the money that the petitioner withheld, they were the rightful owners of the funds. (Tr. 649-650.) Moreover, she asserted that the evidence established that the nurses were employees, not independent contractors. She pointed to the following factors: the petitioner provided each nurse with "a

7

badge that has the name of Harry's Nurse's Registry, with the name of the employee[;]" the nurses were "paid per hour" and the petitioner "gave them . . . time sheets," thereby "[e]xercising control over how the [nurses], his employees were to be paid[;]"there was "[i]n-service training[;]" if the nurses could not work "[i]t was petitioner's responsibility to find a replacement[;]" the nurses were paid by the petitioner rather than by their patients; and the nurses and the Registry were in the same line of business. (Tr. 643-644; 648.) Thus, the petitioner "had direction and control over every facet of what these [nurses] did." (Tr. 644.) She argued that because the nurses were employees, it was unlawful for petitioner to pass along to them the cost of workers' compensation coverage. (Tr. 646.)

### D. Jury Instructions and Conviction

In his final charge, Judge Blumenfeld gave the standard charge on expert testimony, explaining that a witness with expertise in a specialized field may provide his opinion if specialized knowledge will help the jury understand evidence or special knowledge will help the jury understand evidence or to determine a fact in issue. (Tr. 665.) He advised the jurors that as judges of the facts, they were free to accept or reject the expert's conclusion. (Tr. 663-665.)

On May 10, 2012, the jury convicted the petitioner and the Registry of the grand larceny charges, but acquitted them of Scheme to Defraud. (Tr. 723-733.)

    III.    <u>State Appeals and Collateral Attacks</u>

### A. C.P.L. § 330.30(1) Motion to Vacate

On May 22, 2012, the petitioner, through his lawyer, moved pursuant to C.P.L. § 330.30(1) to vacate his grand larceny conviction on the grounds that there was insufficient evidence to establish that the nurses owned the withheld funds, or that he intended to steal from them. (Tr. 755-763.) In particular, he argued that "[t]he evidence showed no intent on the part of

8

the defendant to deprive the [nurses] of money since it was undisputed that the monies were paid for worker's compensation coverage." (Tr. 760.)

On June 25, 2012, Judge Blumenfeld denied the motion:

> "The defendant's definition of larceny is too narrow. Larceny does not require just taking, but also obtaining or withholding property from someone who's [sic] right to possess this property is superior to the defendant who took, obtained or withheld (*see* Penal Law § 155.00[5]). It is clear under the law that the jury could find that the defendant committed larceny in that the defendant withheld a certain amount from the complaints' hourly wage to pay for workers compensation insurance that he was not entitled to withhold. A review of the trial record in the light most favorable to the People [citation omitted] reveals that there was legally sufficient evidence to establish the defendants' guilt."

(Tr. 776-777.)

The petitioner retained a different lawyer, who filed a second § 330.30 motion on September 10, 2012. (Tr. 783-798.) In this motion, the petitioner asserted his trial lawyer was ineffective because he did not present evidence that the petitioner relied on his accountant's advice when he deducted the funds from the nurses' paychecks; the petitioner argued that this evidence would have supported the argument that the petitioner did not intend to steal. (Tr. 794-795.) Additionally, the petitioner asserted that his grand larceny convictions were inconsistent with his acquittal for Scheme to Defraud because the charges "all premised upon a single *modus operandi*." (Tr. 787.)

On October 4, 2012, Judge Blumenfeld denied the petitioner's second 330.30 motion. (818-823.) He found that the ineffective assistance claim of counsel claim was based on matters outside of the record and thus not a proper subject for a 330.30 motion. (Tr. 821.) He also found that the grand larceny convictions were not inconsistent with the Scheme to Defraud acquittal because each charge required different findings of intent: the grand larceny charges required the jury to find that the petitioner had the "intent to deprive another of property or to appropriate the

9

property to himself or itself." (Tr. 819-820.) In contrast, the Scheme to Defraud count required that the jury find that the petitioner had "the intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretenses, representation or promises." (Tr. 819-820.) Thus, it was permissible for the jury to determine that the petitioner intended to steal, while at the same time finding that he did not intend to defraud ten or more people by using false pretenses. (Tr. 820.)

The same day, Judge Blumenfeld sentenced the petitioner to 13 concurrent five-year terms of probation, a fine of $2,000 on each of the 13 counts, and to 13 days of community service. (Tr. 24.)

### B. Direct Appeal

On October 12, 2012, the petitioner appealed his conviction to the Appellate Division, Second Department, arguing that trial counsel was ineffective for failing to argue that the nurses were independent contractors, not employees. (Pet. App. Br., ECF 6, at 19.) He also faulted that trial counsel for failing to offer evidence that the petitioner relied on his accountant's advice, and thus did not have the intent to steal. (*Id.* at 22-23.) In addition, the petitioner contended that the trial judge interfered in the presentation of the evidence, and that the prosecutor's expert witness, Steven Carbone usurped the jury's function. (*Id.* at 34-56.) Finally, the petitioner claimed that the verdicts were inconsistent. (*Id.* at 57-61.)

On November 5, 2014, the Appellate Division affirmed the petitioner's conviction. *People v. Dorvilier*, 122 A.D. 3d 642 (2014). The court found that the defendant's ineffective assistance of counsel argument was based in part "on matter outside the record and, thus, constitute[d] a 'mixed claim[]' of ineffective assistance." *Id.* Since it was "not evident from the matter appearing on the record that the defendants were deprived of the effective assistance of

counsel," the court found that "a CPL 440.10 proceeding" would provide the "appropriate forum for reviewing the claim in its entirety." (*Id.*)

### C. Coram Nobis

On January 19, 2015, the petitioner, through another lawyer, filed a writ of error coram nobis, this time claiming that his appellate attorney was ineffective because he did not argue that the state failed to prove that the nurses owned the withheld funds. (Motion for a Writ of Coram Nobis at 5.)

On July 29, 2015, the Second Department denied the petitioner's coram nobis motion. *People v. Dorvilier*, 130 A.D. 3d 1061 (N.Y. App. Div. 2d Dept. 2015). Citing *People v. Stultz*, 2 N.Y.3d 277, 285 (2004), the court held that appellate counsel provided "meaningful representation" because "[e]ffective appellate representation by no means requires counsel to brief or argue every issue that may have merit." 2 N.Y.3d at 285. Citing *Jones v. Barnes*, 463 U.S. 745 (1983), the court observed that an appellate lawyer need not "raise every nonfrivolous issue requested by [her] client" because a rule to the contrary "runs the risk of burying good arguments." 463 U.S. at 750-753.

The New York Court of Appeals denied the petitioner's leave application on October 23, 2015. *People v. Dorvilier*, 26 N.Y.3d 1008, 42 N.E.3d 218 (2015).

### D. Federal Habeas Corpus Petition and 440 Motion

On April 12, 2016, the petitioner, proceeding *pro se,* filed this federal habeas corpus petition. (Petition for a Writ of Habeas Corpus, ECF 1.) Construed liberally, his petition raises the two arguments: that his trial and appellate counsel were ineffective because they failed to argue that the evidence was insufficient to support his conviction. (*Id.* at 6.)[5]

---

[5] Opposing counsel has only briefed the question of whether appellate counsel was ineffective, but the petitioner states the following claim in his petition: "Defendant's counsel was ineffective and failed to raise the sufficiency of

11

On October 25, 2016, the petitioner filed a motion pursuant to New York Criminal Procedure Law § 440.10, again arguing that he was denied effective assistance of trial counsel. (ECF 15.) In that motion, he claims that he gave his trial lawyer "administrative decisions, court decisions, and correspondence" on which he claims to have "relied, in good faith" for treating the nurses as independent contractors; he argues that counsel did not present these documents to the jury. (ECF 15, at 4.) It appears that the motion is still pending.

## DISCUSSION

### I. Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), a federal court may not grant habeas relief "on the basis of any claim adjudicated on the merits in state court unless that adjudication 'resulted in a decision contrary to, or [that] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Bennett v. Fischer*, 246 F. App'x 761, 764 (2d Cir. 2007) (quoting 28 U.S.C. § 2254(d)).

AEDPA's standard is purposefully designed to be "difficult to meet," in order to further the important interests of federalism and comity. *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (citation omitted). Federal courts reviewing state criminal convictions serve the limited role of guarding "against extreme malfunctions in the state criminal justice systems," and are not "substitute[s] for ordinary error correction through appeal." *Id.* (citation omitted). Thus, the

---

the evidence that was claimed in accordance with the Court's precedent. The People failed to establish that defendant actually stole money from its owner, a key element of the charged crime. Defendants counsel...failed to [raise] this issue with the court." (ECF 1 at 6, n. 12(a)). The petitioner stated, further that his appellate counsel "failed to raise this issue on appeal." (*Id.*, n. 12 (c)). Accordingly, the petitioner claims that both his trial and appellate attorneys were ineffective.

12

petitioner is entitled to relief only when a state court ruling is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

II. <u>Exhaustion</u>

Before a petitioner can seek federal habeas corpus relief, 28 U.S.C. § 2254(b)(1) provides that he must exhaust the remedies available in the state court by giving the state courts a fair and full opportunity to review the merits of the claim. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). In other words, a petitioner must present 'the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

The petitioner exhausted his claim that his appellate counsel was ineffective. He presented this claim in his coram nobis motion and the Appellate Division rejected it, thus constituting an "adjudication on the merits" for purposes of Section 2254(d). *See Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits.").

By contrast, the petitioner has not exhausted his claim that trial counsel was ineffective. Although he raised the argument in his second 330 motion and on direct appeal, those were not—as both the trial judge and the Appellate Division found—the appropriate avenues to pursue the claim, since it involved facts outside the record. (TR 818-23); *People v. Dorvilier*, 122 A.D.3d 642, 643, 996 N.Y.S.2d 111, 113 (N.Y. App. Div. 2d Dept. 2014). He has a 440.10 motion on the same subject pending in state court. There is no evidence in the record that the state judge has decided that motion.

"Under Second Circuit law, a court faced with a mixed petition must determine whether it is appropriate, on one hand, to dismiss the petition in its entirety, or, on the other, to dismiss the unexhausted claims, pending further state proceedings, while staying action on the exhausted claims." *Rosas v. Artus*, No. 05 Civ. 8440 (KMK), 2007 WL 1573919, at *1 (S.D.N.Y. May 24, 2007) (citing *Diaz v. Smith*, No. 04 Civ. 1337, 2004 WL 2360140, at *1 (S.D.N.Y. Oct. 19, 2004); *Zarvela v. Artuz*, 254 F.3d 374, 380 (2d Cir. 2001)); *see also Ortiz v. Heath*, No. 10 Civ. 1492 KAM, 2011 WL 1331509, at *14 (E.D.N.Y. Apr. 6, 2011); *Castillo v. Donelly*, No. 06 Civ. 3388 (SJF), 2007 WL 1395463, at *7 (E.D.N.Y. May 7, 2007).

"A stay 'is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court[;]...even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Rosas, 2007 WL 1573919, at *1 (quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005)). Moreover, "an application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). *See, e.g., Greiner v. Wells*, 417 F.3d 305, 318, n. 14 (2d Cir. 2005) ("By reaching the merits of [a section 2254 petitioner's] ineffectiveness claim ... [the Court] need not consider the exhaustion issue") (internal quotation and citation omitted), *cert. denied*, 546 U.S. 1184, 126 S.Ct. 1363, 164 L.Ed.2d 72 (2006); *McCray v. N.Y.*, No. 10 Civ. 465 RJD, 2013 WL 635950, at *3 (E.D.N.Y. Feb. 20, 2013) ("[T]he Court need not formally reach the exhaustion question because, as the Court now addresses, the petition does not present a basis for habeas relief."), *aff'd*, 573 F. App'x 22 (2d Cir. 2014).

III. The Merits

To prevail on a claim of ineffective assistance of counsel, the petitioner must show that his "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and "that the deficient performance prejudiced the defense." *Id.* at 687. Moreover, the petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The purpose of the Sixth Amendment effective assistance of counsel guarantee 'is not to improve the quality of legal representation, .... [but] simply to ensure that criminal defendants receive a fair trial.'" *Greiner v. Wells*, 417 F.3d 305, 318–19 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* (quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052). "Rather, '[t]he essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.'" *Id.* (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).

The petitioner asserts that his trial and appellate counsel were ineffective because they did not challenge the sufficiency of the evidence and because his trial counsel did not present evidence that he claims would have negated the element of intent. I address these arguments in turn.

    a. Sufficiency of the Evidence

In New York, "[a] person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." N.Y. Penal Law § 155.05. The petitioner claims that the state did not establish the element of ownership.

According to the petitioner, the state was required to show that the nurses had physical possession of the stolen property. By this logic, the nurses would only be considered "owners" once the funds were transferred into their accounts. The statute, however, defines an "owner" as "any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." N.Y. Penal Law § 155.00(5). The New York Court of Appeals has held that "the definition of ownership does not require that the owner have 'an independent right of possession but only that he [or she has] a possessory right which, however limited or contingent, [is] superior to that of [the] defendant.'" *People v. Matthew P.*, 26 N.Y.3d 332, 336 (2015) (citation omitted). The possessory right includes "a legally recognizable interest in property." *People v. Izzo*, 409 N.Y.S.2d 623, 624 (Crim. Ct. 1978) (citation omitted); *see also People v. Hutchinson*, 56 N.Y.2d 868, 869, 438 N.E.2d 1109, 1110 (1982) (larceny statute "did not require proof here that [the owner] had an independent right of possession but only that he had a possessory right which, however limited or contingent, was superior to that of defendant").

Thus, the state did not have to prove that the nurses had actual possession of or immediate physical control over the funds; rather, it was enough to show that they had a legally recognizable interests in the funds, and that the petitioner did not. In New York, employees have legally recognizable rights to their withheld wages. *See, e.g., Marconi v. Bd. of Educ. of Seaford Union Free Sch. Dist.*, 627 N.Y.S.2d 714 (1995) (public school teacher had property interest to withheld salary); *Tini v. AllianceBernstein L.P.*, 968 N.Y.S.2d 488, 489 (2013) (unpaid salary and commission constitute "wages" under Labor Law § 190(1) and employees can sue for the withheld amount pursuant to New York Labor Law § 198); *Dragone v. Bob Bruno Excavating, Inc.*, 847 N.Y.S.2d 251 (2007) (same). Accordingly, as Judge Blumenfeld explained when he denied the petitioner's motion to vacate his conviction, "[i]t is clear under the law that the jury

could find that the defendant committed larceny in that the defendant withheld a certain amount from the complaints' hourly wage to pay for worker's compensation insurance that he was not entitled to withhold." (Tr. 776-777.)

    b. Failure to Present Evidence

The petitioner also argues that his trial attorney did not present available evidence that would have shown he did not have the intent to steal. In his second 330 motion, the petitioner submitted an email from his accountant, Eric Rogers, including an "informal opinion...representing the position of the New York State Insurance Department" regarding "independent contractors and workers' compensation coverage." (TR 810-811.) The decision addressed "whether [a] for-profit corporation's instructors [we]re independent contractors" or otherwise "excluded from the definition of employee" but concluded that these were "questions for the Workers' Compensation Board to determine." (TR 810-811.) The petitioner appears to re-assert the argument he made in that motion: that his trial attorney should have included this correspondence in the trial record. (TR 792-94; ECF 15 at 6.) The final paragraph of the email, however, states explicitly: "We cannot express an opinion regarding the potential determination of the Workers' Compensation Board as to whether the for-profit corporation's instructors are independent contractors or employees. Any questions regarding the interpretation of the New York Workers' Compensation Law should be addressed to the Workers' Compensation Board." (TR 811.) Accordingly, because the correspondence made it clear that the petitioner should not rely upon this determination, it was reasonable for the trial attorney to exclude this email from the record.

The petitioner also points to a New York State Unemployment Insurance Appeal Board decision issued in 1999 finding that nurses who worked for the Registry between 1993 and 1995

17

were independent contractors, not employees, (ECF 4, at 3-4),[6] as well as a 2006 letter from Lauren Hill, the underwriter for the New York State Insurance Fund who testified at his trial. (ECF 4 at 19.) Consistent with her testimony, Hill's letter states that after an audit, the state insurance fund "amend[ed the petitioner's] policy to include all of [his] 1099 workers" resulting in a "substantial increase in premium." (*Id.*) Thus, Hill's letter and testimony show that she informed the petitioner in 2006 that several nurses who filled out 1099 forms were not covered by the petitioner's worker's compensation policy and that she adjusted the policy to include those nurses. (Tr. 569-582.) Since the petitioner's criminal case involved nurses who worked for the Registry between 2006 and 2007, his trial and appellate attorneys may have reasonably concluded that the 1999 decision was irrelevant in light of Lauren Hill's testimony and letter.

In sum, the petitioner has not shown that his trial counsel's performance was deficient.[7] As the Supreme Court has explained,

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

---

[6] The petitioner also included a decision issued in 2014, after the Appellate Division issued its opinion. This decision is irrelevant to the plaintiff's ineffective assistance of counsel claims since neither attorney could be expected to rely on a document that did not yet exist.

[7] To the extent the petitioner challenges his appellate attorney's failure to raise this issue on appeal, that argument is unavailing, as well. His appellate attorney did, in fact, argue that trial counsel was ineffective and, as discussed above, the Appellate Division held that since the claim was based on information outside the record, "a CPL 440.10 proceeding [would be] the appropriate forum for reviewing the claim in its entirety." *People v. Dorvilier*, 122 A.D.3d 642, 643, 996 N.Y.S.2d 111, 113 (2014).

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *accord Lebron v. Mann*, 844 F. Supp. 140, 144–45 (E.D.N.Y.), *aff'd*, 40 F.3d 561 (2d Cir. 1994). The defendant has not submitted any evidence or made any arguments that "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.[8]

Based on the evidence presented at trial, the petitioner has not met his burden under the second prong of the *Strickland* test, either. The state adequately established that the withheld funds were wages the nurses had earned during the period in question, and that the petitioner did not have a right to deduct workers' compensation from the nurses' paychecks. The nurses did not receive advanced notice that the petitioner was going to deduct the money, nor did they consent to the withholdings. (Tr. 197, 274, 333, 360, 379, 438, 455, 553.) The state's expert witness testified that under New York law, employers are solely responsible for their workers' compensation. (Tr. 484.) He also testified about the distinction between independent contractors and employees, and concluded that the nurses were employees. (Tr. 488-489.) The evidence does not support a finding that the result of the proceeding would have been different if his attorney presented the evidence that the petitioner cites, or otherwise challenged the sufficiency of the evidence. Accordingly, the petitioner has not demonstrated that he is entitled to habeas relief.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is dismissed, and the writ is denied. Because the plaintiff has not made a substantial showing that he was denied

---

[8] The Second Circuit recently affirmed a determination that nurses who worked for the Registry during the relevant time period were, in fact, employees and not independent contractors for purposes of their claims for overtime pay pursuant to the Fair Labor Standards Act (FLSA). *Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 717 (2d Cir. 2014); *see also Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672 (CPS) (MDG), 2009 WL 605790, at *11 (E.D.N.Y. Mar. 9, 2009) (noting that the class of nurses worked for the Registry from 2004 through 2009). While the FLSA does not control the determination of whether a worker is an employee or an independent contractor for other purposes under state law, it is noteworthy that the petitioner submitted a letter indicating that the New York Department of Labor "tried to have the [Registry's workers] classified as employees" after the Second Circuit's decision, as well. (ECF 4 at 8-9.)

any constitutional rights, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2). I certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

                                              s/Ann M. Donnelly
                                              Ann M. Donnelly
                                              United States District Judge

Dated: Brooklyn, New York
May 31, 2017